# MUNICIPAL COURT.

## BOSTON, JANUARY, 1823.

*The Commonwealth*
vs.                    } LIBEL.
*Joseph T. Buckingham.*

Present—Honourable *Peter O. Thatcher*, Judge.

*James T. Austin, Esq.*, Counsel for the Commonwealth.

*Hon. Benjamin Gorham* and *S. L. Knapp, Esq.* Counsel for Defendant.

This was an indictment found by the Grand Jury for the county of Suffolk, at the November term, 1823, of the Municipal Court for the city of Boston. The cause was continued, and afterwards assigned for Friday, January 9th, 1824. The court opened at 9 o'clock, A. M.

## INDICTMENT.

*Commonwealth of Massachusetts.*—Suffolk, to wit: At the Municipal Court of the city of Boston, begun and holden at said Boston, within, and for the county of Suffolk, on the first Monday of November, in the year of our Lord, one thousand eight hundred and twenty-three.

The Jurors for the Commonwealth of Massachusetts on their oath present, that Joseph T. Buckingham, of Boston aforesaid, Printer, on the first day of September, in the year of our Lord, one thousand eight hundred and twenty,—at Boston aforesaid, with force and arms, maliciously contriving and intending to injure, aggrieve, villify, scandalize, and defame the good name, fame and reputation, of one Alexis Eustaphieve, who was then and there residing in said Boston, and was then and there a Consul accredited to the United States of America, from His Majesty the Emperor of all the Russias, with whom the said United States then were, and still continue to be, at peace, and intending as much as in him lay, to bring the said Alexis

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

.into *contempt, hatred, infamy,* and *disgrace,* did compose, print, and publish in a certain newspaper, called New-England Galaxy and Masonic Magazine, whereof the said Buckingham was editor and publisher, a certain false, scandalous, and malicious libel, and did cause and procure to be published in said newspaper, the said certain false, scandalous, and malicious libel of, and concerning the said Alexis, and of and concerning *the conduct of the said Alexis as a parent, and of, and concerning the manner of treatment by said Alexis' daughter,* in which said malicious, false, and scandalous libel is contained, among other things, the false, scandalous, and malicious words following, that is to say, "We in this part of the union boast much of our skill in music, but a few of us who have been in Europe are unwilling to see this divine art treated with such little respect as to witness the total want of taste, expression, and feeling in our musical friends. We should no longer award the palm to those [meaning among others the said daughter of said Alexis] who by incessant drilling under a cruel and heartless master, [meaning said Alexis,] have attained a rapidity of fingering which serves only to astonish for a moment, but which produces no effect upon the feelings, except pity for the almost lifeless astomaton [meaning the said daughter of of said Alexis] whose haggard cheeks and feeble frame evince the daily drudging to which [meaning the said daughter of said Alexis] has been subjected by threats, promises, and flattery ; a feeling which is not alleviated by the smallest ray of kindness or affection in the parent, [meaning said Alexis] who [meaning said Alexis] sacrifices all the future prospects of a child's, [meaning the said daughter of said Alexis] happiness at the altar of ambition, a virtuous and enlightened community should frown indignation and contempt upon the tyrant, [meaning said Alexis]" to the great damage of said Alexis, to the pernicious example of all others in like case offending, and against the peace of said Commonwealth.

And the jurors aforesaid, on their oath aforesaid, do farther present, that said Joseph T. Buckingham, at said Boston, with force and arms, on the thirthieth day of November, in the year of our Lord eighteen hundred and twenty-one, farther contriving and intending to injure, scandalize, vilify, and defame the good name, fame, and reputation of said Alexis Eustaphieve, then residing in said Boston, and performing the duties of a Consul of the Emperor of all the Russias, with whom said Commonwealth then was, and yet continues to be, at peace, and maliciously contriving and intending as much as in him lay, to bring the said Alexis into public ridicule, contempt, and disgrace, did compose, print, and publish, and did cause and procure to be composed, printed, and published in a certain newspaper, entitled, New-England Galaxy, a most wicked, false, scandalous, and malicious libel of, and concerning, the said Alexis, and of, and concerning the life and opinions of said Alexis; which said libel contains, among other things, the false, scandalous, and defamatory words following, that is to say, "The life and opinions of U. Stuffy, [meaning said Alexis,] 1 vol. 4to. imperial foolscap, bound in Russia—contents, chap. 1: His [meaning said Alexis] birth and infancy, sucks a bear, Romulus and Remus—His [meaning said Alexis] wet nurse licks him [meaning said Alexis]—weaned on fish's roe and fiddlehead—How he

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

[meaning said Alexis] gets on in every thing—His [meaning said Alexis] amusements, fishing and fiddling,"

And, also, the following false, scandalous, and defamatory words, that is to say, " Chap. VI. His [meaning said Alexis] dislike to Caledonian literature, and why—His [meaning said Alexis] being taught to dance to the Scotch fiddle, and the superiority of the latter to his [meaning said Alexis] own.—Burnt bear dreads hot iron—Comdemns the author of Waverly, supposing him to be a Scot. A set-to between the big bear [meaning said Alexis] and a dandy—Pro and con. concerning the same,"—to the pernicious example of all others, and against the peace of said Commonwealth.

And the jurors aforesaid, on their oath aforesaid, do further present, that said Joseph T. Buckingham, at said Boston, with force and arms, on the seventh day of November, in the year of our Lord eighteen hundred and twenty-three, further continuing his malicious disposition, and contriving and intending, falsely and maliciously, to injure and destroy the good name, fame, and reputation of the aforesaid Alexis Eustaphieve, the said Alexis then residing in said Boston, and being the Consul of the Emperor of the Russias within said Commonwealth between whom and said Commonwealth, there then was a firm peace, and to cause a belief that said Alexis engaged in quarrels unworthy his said station and office, did compose, print, and publish, and cause and procure to be composed, printed, and published in a certain newspaper, called New-England Galaxy, a certain false, scandalous, malicious, and defamatory libel of and concerning the said Alexis, and of and concerning the conduct and behaviour of the said Alexis, at a certain place in said Boston, commonly called Concert Hall, on Tuesday, the fourth day of said November, at a certain exhibition and ball there given by certain persons called Parks and Labasse, and after the same, which said false, scandalous, and malicious libel contains the false, scandalous, and defamatory words following, of and concerning said Alexis, and of and concerning his conduct at said place, called Concert Hall, that is to say :—" Record of fashion.—The pupils of Messrs. Parks & Labasse gave a splendid exhibition of dancing at Concert Hall on Tuesday. The elegance of attitude, and the gracefulness and ease of their movements, afforded a proof of the science, skill, and taste of their instructors, and elicited the approbation of a crowded and fashionable concourse of spectators. A communication respecting this exhibition and ball has been received, the chief object of which is to give the details of an unpleasant and disgraceful disturbance which occurred in the course of the evening. The history would not do much honour to the parties concerned, and we [meaning said Buckingham] decline its publication at present, though it is but just to the character of Mr. Parks to say, that we [meaning said Buckingham] have not heard that any blame was attached to his conduct on the occasion, but that on the contrary, he kept as much aloof as possible from the scene of anger and confusion. The rugged Russian bear, [meaning said Alexis] it is said, was a conspicuous actor in the farce which had well nigh turned out to be a tragi-comedy, in consequence of his [meaning said Alexis] attempting to jump with his [meaning said Alexis] cocked hat and all down the throat of one of his [meaning said Alexis] opponents. We [meaning said Buckingham] think with our [meaning said

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

Buckingham] correspondent, that it is best at the present moment to give no opinion on the merits of the controversy, but leave it to the decision and final adjudication of him [meaning said Alexis] who, [meaning said Alexis] while acting as the representative of the greatest monarch in the world, the magnanimous Alexander, the Autocrat of all the Russias, the honorary member of the Massachusetts Peace Society, the grand Pacificator of Europe, does not deem it a derogation from his [meaning said Alexis] high vocation to become a party in the quarrels of dancing masters and fiddlers,"—meaning that said Alexis was a party in the quarrel of dancing master and fiddlers at said Concert Hall, at the time aforesaid, and then being Consul as aforesaid, against the peace of said Commonwealth.

A true bill, WM. JENNISON, Foreman G. J. James T. Austin, Attorney for Commonwealth.

True Copy.   Attest, W. MINOT, Clerk Municipal Court.

After the indictment was read, the attorney for the commonwealth stated to the jury, that it contained three distinct counts, each of which was a distinct, independent indictment, and consequently that a conviction or acquittal on either, would not amount to a conviction or acquittal on either of the others.

Messrs. Jefferson Clark, Ezekiel Morse, John S. Ellery, Bryant P. Tilden, Alexis Eustaphieve, and William Coffin, were examined as witnesses on the part of the prosecution, to prove the publication, and that the articles complained of had reference to Mr. Eustaphieve.

It appeared, that the third count in the indictment was at variance with the article in the paper; the word "evening" after Tuesday having been omitted. After argument, the court decided, that the variation was fatal to that count, and consequently no testimony relating to it could be admitted. In the course of the trial, the attorney for the commonwealth entered a *nolle prosequi* on the third count.

Mr. *Knapp* opened the defence. He contended, that the articles complained of were not libellous; that the first could have no allusion to Mr. Eustaphieve; and that the second was a good-natured and harmless piece

of satirical writing, which only ridiculed the writings of the complainant, and was common and justifiable. He read the case of Sir John Carr v. Hodgdon and others, which, it was contended, was applicable to this case.

The court adjourned to three o'clock, P. M.

Mr. *Knapp*, in continuation, stated, that the piece complained of in the first count of the indictment, was a piece of general criticism ; that it contained no allusion to the prosecutor ; that it was general in its intent and tendency; that he (the prosecutor) had no more right to apply the remarks to himself, than any man who had given a piece of bread or a cup of water to a perishing fellow creature, had to appropriate to himself all the eulogiums which ages had bestowed on the charitable and philanthropic ; no more than an individual miser had to make a personal application of all the invective and reproach which have been bestowed on niggardliness and avarice. That it could not allude to Mr. Eustaphieve and his daughter, was evident. The testimony of Messrs. Ellery, Tilden, and Coffin, all proved that he was a kind and indulgent father. The publication alluded to, and concerned, a general system of education, where severity was used to promote improvement.

In respect to the piece charged as libellous in the second count of the indictment, Mr. Knapp could not believe, for a moment, that the jury could consider it as a libel. It was a mere bagatelle—such as is found every day in the newspapers and reviews, and which no man but one of extreme excitability ever thinks of resenting seriously. He acknowledged that it *might* allude to Mr. Eustaphieve ; but it amounted to nothing more than an attempt to raise a laugh at his writings. Mr. Eustaphieve was an author—he had written a play—sundry political

works—dramatic criticisms—and an epic poem. His taste and opinions differed from those of the Americans, and he had attempted to correct what he supposed to be our bad taste. The public did not much approve his epics; but he (Mr. Knapp) hoped that posterity would do him justice. Homer was not rewarded in his own day and by his own countrymen, but later ages had given him the praise which was due to him. Mr. Eustaphieve, in the piece in question, was ridiculed as an author. There was no imputation on his official or moral character; there was no charge, which if true, could subject him to any sort of legal punishment; nothing which could in the least degree affect his standing in society. It might be true, that he was there alluded to by the word *bear*. But this was not a term of reproach. The term signified, figuratively, strength and wisdom. *Bear*, in hieroglyphics, according to *Bailey*, was used by the ancient Egyptians, to represent a good proficient, when time and labour has brought to perfection, because bears are said to come into the world with misshapen parts, and that their dams do so lick the young, that at last the eyes, ears, and other members appear. Shakspeare making king Henry say,

> Call hither to the stake my two brave *bears*,
> Bid Salisbury and Warwick come to me, &c.

Messrs. E. Frothingham, J. Dodd, T. Minns, John Parker, and Thomas Grainger, were called and sworn as witnesses on the part of the defendant.

E. Frothingham testified, that when he read the piece complained of in the first count, he did not consider it as applying to Mr. Eustaphieve. There was a foreigner in Boston some years ago, who had two or three children remarkable for their acquirements in music, and

whose system of discipline was cruel and severe. That he had seen this man, at a certain time, strike one of the children in a large party, where the circumstance excited considerable feeling, and was thought to be cruel.

Mr. Dodd's testimony was essentially the same.

The other witnesses sworn on the part of the defendant, were not examined ; the court having decided, after arguments, that the testimony expected to be drawn from them was inadmissible.

Mr. *Gorham*, in closing the defence, regretted that the testimony, which had been thought material by the defendant's counsel, should have been excluded by the court. It was their intention to have shown, by undoubted testimony, that the prosecutor had subjected himself to animadversion in the newspapers as an author and a critic, assuming the office of a dictator in matters of taste, and endeavoring to direct our public amusements, and give a tone to public sentiment ; that, as such, he had no right to complain, if he were dealt with as all others are who follow the same course. This prosecution, Mr. Gorham contended, was not commenced in order to preserve the public peace, nor was it necessary, to that end, that it should have been brought forward at the present time. It was instigated by anger and resentment on the part of the prosecutor. Else why had the attorney for the commonwealth and eight or ten successive grand juries, whose duty it is to prosecute all breaches of the peace, been silent on the subject for more than three years ? It was evident, that the temper of the complainant had incited him to procure the present indictment, and that, in fact, he was now the aggressor, and committing an act which tended to a breach of the peace. He denied that the first piece alleged to be li-

bellous had any allusion to the Russian Consul. It was a piece of criticism, general in its nature and object, and it had been proved that there was another individual in Boston at the time of its publication, to whom the censure would equally apply. Admitting that it did allude to him, the defendant ought not to suffer for its publication ; for he was much absent at the time, and knew but little of what was inserted in the paper, owing to sickness and death in his family. The very paper which contained the alleged libel, contained notice of the death of one of his children, and an apology for his neglect of editorial duties. As to the second piece, Mr. Gorham declared it was no more a libel than was the piece called *My Pocket Book* on Sir John Carr, which Lord Ellenborough had scouted out of court, as the jury already knew from the case which had been read to them. He admitted that it was coarse and rude ; but that it could not injure the reputation of any man; it had very little wit in it : and that he should rather be the *subject* than the *author* of it. If it alluded to Mr. Eustaphieve at all, it alluded to him as a writer. Mr. E. had written some works, which had been severely handled by the Edinburgh Reviewers, and he had replied, in a strain which indicated that he was not pleased with their criticisms. This was what was meant by " his dislike to Caledonian literature —and why." His uneasiness under the lash they had inflicted was pretty evident, and this was all that was intended by "dancing to the Scotch fiddle." Mr. Gorham dwelt with emphasis on the fact, that the latest of the pieces complained of appeared more than two years ago ; a circumstance which precluded the prosecutor from claiming any redress in a civil action.

Mr. *Austin* summed up the testimony for the prosecu-

tion, and commented thereon with his usual clearness and rapidity. The defendant being proved to be the editor and proprietor of the Galaxy, it was of no consequence, (he said,) whether he was in the office at the time of the publication or not. He was responsible for all that appeared in the paper. It was for the jury to consider whether the articles complained of were libellous; and that the first one was so, he thought no one doubted. It had been shown that it could apply to no one else but the Russian Consul, and it was calculated to wound him in the tenderest point, by holding him up to the indignation of the public as a cruel and heartless father. The piece complained of in the second count, he contended, was also grossly libellous; and the writer could have had no other object than to expose Mr. Eustaphieve to public scorn and ridicule. Mr. Austin spoke about twenty-five minutes, and at the conclusion of his argument, the court adjourned to nine o'clock the next morning.

BOSTON
Jan. 1823.

The Com'th
v.
Buckingham.

On the opening of the court on Saturday, his honor Judge Thatcher charged the jury as follows:

*Gentlemen of the Jury,*

The defendant, Mr. Buckingham, is charged with the offence of having composed, printed, and published two libels against Alexis Eustaphieve, the Consul of his Russian Majesty residing in this city, with the malicious intent to defame and vilify him, and bring him into contempt, hatred, and ridicule. The first relates to his conduct as a parent; the second, to his life and opinions. The third count has been withdrawn since the commencement of this trial, and must be wholly disregarded by you. In legal contemplation the two counts are several indictments. The defendant may be

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

convicted on one and acquitted on the other ; or you may render a general verdict on both, as you shall finally consider yourselves justified by the law and the evidence. It has not been controverted that the pieces complained of are set forth in the indictment correctly.

You must be satisfied, before you can find a verdict against the defendant, that the pieces which are complained of were published by him—that they relate to the Russian Consul, and are libels upon him—and that they were published by the defendant with the malicious intent to defame the Russian Consul, and to bring him into hatred, contempt and ridicule.

On you devolves the duty " to decide at your discretion, by a general verdict, both the fact and the law involved in this issue." But in committing the case to you, it belongs *to me to expound to you*, with candor and simplicity, the principles of law which are applicable to it, with the view of assisting you in the performance of your duty, and to enable you to come with confidence to a correct result.

Trials of this kind are rare, and, perhaps, from that cause they excite a degree of interest which is out of proportion to the offence.

But if from any cause you are conscious of any undue interest, or feel any prejudice, you will suffer me to caution you to dismiss them from your bosom as the enemies of good judgment.

Though this case, as most other criminal prosecutions, might have had its origin in the complaint of an individual, you are not trying the complaint of an individual, but a presentment of the grand inquest on their oaths, who are bound by law " diligently to inquire, and truly to present all crimes and offences committed within

the body of this county." This is not, therefore, a vindictive suit by the Russian Consul, to recover damages for wounds inflicted on his character and feelings. So far as these are concerned, the remedy is by a civil process in another court, and, whatever may be the event of this prosecution, the personal injury and the civil redress will in no degree be affected.

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

The questions, what is a libel, and why it is deemed a public wrong, are answered in a clear and satisfactory manner by our Supreme Judicial Court, in the case of The Commonwealth vs. William Clapp, 4 Mass. Rep. 165. The opinion in that case was pronounced by the late Chief Justice Parsons, who was a most humane judge of Criminal Law, and always gave to a party on trial the full benefit of his learning and talents, to screen him from an illegal conviction.

" A libel is a malicious publication, expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of the dead, or the reputation of one who is alive, and exposing him to public hatred, contempt or ridicule."*

" The cause why libellous publications are offences against the state, is their direct tendency to a breach of the public peace, by provoking the parties injured, and their friends and families, to acts of revenge, which it would not be easy to restrain, were offences of this kind not severely punished." A citizen would be apt to consider himself justified in revenging himself on one who

* See Hamilton's definition in Croswell's case, 3 Johns. Cases, 254. The freedom of the press is now amply protected in New York by the following provision in the constitution: "Every citizen may free-

ly speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or the press. In all prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted, and the jury shall have the right to determine the law and the fact." Art. 7, § 8. See also the remarks of the Recorder, ante. vol. 1, p. 353, 4.

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

had maliciously defamed him, and rendered him an object of hatred, contempt or ridicule, if the society to which he belonged did not punish the offender. Our law is not defective in this particular, and all pretence for private violence is removed. "A man appealing to the public justice for redress of an injury, must think himself acquitted in his reputation, when he sees that the state resents as an insult to itself a wrong done to his person, property or character." Private revenge for injuries received is a violation of that first principle of society by which each member agrees to give up a portion of his natural rights to secure the more perfect enjoyment of the remainder. No man under the protection of the law is to be the avenger of his own wrongs.

It requires no argument to prove that a libellous publication is not less likely to produce violations of the peace, because it is founded in truth. And therefore, however, it is, that if a man publishes an injurious truth of another, the truth of the publication will be a justification in a civil action for damages; yet such defence will not avail in an indictment for a libel, except in the case which arises from the genius of our constitution, "of publications respecting candidates for a public office, conferred by the election of the people, and of persons holding a public elective office," the people having an interest in the publication of truths relating to their public servants. The exception extends also to the case "of complaints to the legislature for the removal of an unworthy officer," and to some other cases; where the purpose being first proved to be justifiable, that is, done with good motives and a justifiable end, a defendant might be permitted to give in evidence the truth of the words.

I think this exception secures to the public all necessary intelligence upon all proper occasions, and would protect printers in publishing facts relating to individuals, in which the community has an interest, in many of those cases to which the honourable and learned counsel for the defendant alluded in his closing argument, where such publications should not carry on their front the palpable intention to defame.

Considering the interest which seems to be attached to this subject, you will permit me to detain you, for a moment longer, on the law of libel, which I consider has been established in this commonwealth on principles of the highest wisdom.

The great struggle in England forty years ago, on this subject, arose frrom the judges having arrogated to themselves the right exclusively to decide in all cases the question, whether a publication complained of were a libel or not, and from their directing the jury to pronounce a general verdict of guilty or not guilty, as they should be satisfied that the defendant did or did not publish the paper, and as it was or not truly set forth. The British nation justly considered this as stripping the subject of his defence of a trial by jury, and the struggle resulted in the act of 32 Geo. III. c. 60., which declared, "that on every trial for a libel, the jury sworn to try the issue might give a general verdict of guilty or not guilty upon the whole matter put iu issue, and should not be required or directed by the court or judge before whom the trial was had, to find the defendant guilty, merely on the proof of the publication by such defendant of the paper charged to be a libel, and of the sense ascribed to the same in the indictment."

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

During the debates on this bill in the House of Lords, the twelve judges, upon a question put to them, declared " that the truth or falsehood of the written papers are not material to be left to the jury upon the trial of an indictment for a libel; and that it made no difference, whether the epithet *false* were or were not used in it." The greatest lawyers, statesmen, and orators of the English nation took a part in this interesting discussion. But they were content to restore to juries their right of deciding both on the law and on the fact, as it undoubtedly existed at the common law. No one contended that on an indictment for a libel, the truth of the matter should be a defence to the charge; and we do not find in the statute itself, that there is any provision on this point. And yet, gentlemen, the great Lord Erskine, the champion of English liberty, of the rights of the press, and of the trial by jury, and who has just closed his mortal career, observed in the House of Lords, upon a solemn occasion, so late as the year 1808, " that the law of libel had been brought as near perfection as was perhaps possible : though in earlier life, he did not think that the practice of the courts was right in some points, yet he had lived to see it remedied." 30 State Trials, 1344.

In this commonwealth the citizens enjoy, in cases of this description, every privilege which is secured to the subjects of Great Britain, together with the farther right, that the truth shall avail as a justified defence, in certain cases, arising under our peculiar political institutions, to which I have before alluded. The law on this subject was settled on great consideration, in the case against *William Clap*, by the Supreme Judicial Court, to which an appeal lies in all cases from this court, and which, by its prerogative, corrects the errors of all other judicial

tribunals of the commonwealth. The decisions of that
court are reported by a public officer, under the authority
of the legislature, as the most authentic expositions of the
law, for the purpose of diffusing among the citizens infor-
mation on subjects of the greatest interest. The solemn
decisions of that court are considered as binding on the
several judges at their Nisi Prius terms, and on all inferior
tribunals. I freely avow, that I consider them as binding
on me, generally upon the principle, that what is deter-
mined in that court, upon solemn argument, establishes
the law, and is a precedent for future cases in that and in
all inferior tribunals. *Eadem lex Romæ, eadem Capuæ.*
It is the right of the citizen to be governed by *certain laws.*
Now, what *certainty* would there be in laws, if a different
rule of interpretation, on any subject, should be adopted in
this court from what prevails. in the Supreme Judicial
Court on the same subject? It would at once take from
the minds of the citizens all confidence in the administra-
tion of justice here.

The law, as it is laid down by the Supreme Court in
Clap's case, is not in violation of the constitution. That
instrument is to be construed so as that its various provis-
ions may harmonize with each other. While it declares
"that the liberty of the press is essential to the security
of freedom in a state, and ought not, therefore, to be re-
strained in this commonwealth," it guarantees to each
citizen "life, liberty, property, and character." It de-
clares, "that it is essential to the preservation of these,
that there be an impartial interpretation of the laws and
administration of justice;" and it lays down as the first
principle of our government, "that all shall be govern-
ed by *certain* laws for the common good." How long
would "life, liberty, property, and character" be safe,

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

and what would be their value, if the press were not un-
der restraints of the law ?· The liberty of the press is not
confined to publishing truth.   It is as large as human lib-
erty is in any respect.   We are free to act; nor has it yet
been thought an infringement of civil liberty, that we are
answerable for our actions, and liable to punishments for
violations of the law.   So the liberty of the press consists
in being free to publish any thing, true or false,· without
previous restraint, subject only to the control of the law for
the abuses of that liberty.

Among the Romans, it was at one period a part of their
polity, to appoint a censor of the public manners.   Among
other high duties of this officer, he had a right to inspect
the public and private character of the citizens, and might
even degrade a senator from his high rank, if he rendered
himself an object of public odium or contempt.   Modern
governments have not seen fit to imitate this institution.
In our commonwealth, no individual may erect himself
into a sort of domestic tribunal, to try and condemn those
who incur his disappointment, by any singularity of man-
ners, peculiarity of sentiment or character, or even by any
defect in morals.   Nor may he with impunity presume
to hold up his fellow citizens to odium, contempt, or
ridicule.

These principles of law, handed down from antiquity,
and qualified by our own wise institutions, have, I trust,
governed me in deciding some very important questions
which have arisen in the course of this trial ; and it will
not be safe for you, gentlemen, to depart from them when
you retire to make up your final opinion, let them ope-
rate as they may, either for the government or for the
defendant.   Hard would be the task of jurors, and un-
certain would be the tenure of all our rights, if the decis-

ion of cases should depend on the will of jurors, not guided by the known and established rules of law.

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

From this general survey of the law, you will return with me, gentlemen, to the present case, of which I will endeavor to take a summary view.

And first, are you satisfied from the evidence, that the defendant published the pieces which are complained of as libellous? Although the defendant is charged with having *composed*, *printed*, and *published*, it will be sufficient to authorize your verdict, if you believe the fact of *publication* merely.

To this point, you have the testimony of Jefferson Clark, who says, that he has been engaged in the printing establishment of the defendant from the year 1817 to this time, with the exception of a short absence in the year 1822; that the defendant is the publisher and editor of the New-England Galaxy; that he usually corrects the press; that he, the witness, sometimes, but very rarely, and only in the absence of the defendant, performs that duty. When shown the number of the Galaxy of September 1, 1820, which contains the first article complained of, he said he believed it to be a paper which was printed in the office of the defendant, because it resembled the newspaper printed by him, but he would not undertake to swear to the identity of the publication. He says, that at and about that time, the defendant was detained at home, and was a good deal absent from the office, being with his family in the country, who were at that time visited with a domestic calamity. But he was in and out of the office, and he left no substitute to correct the proof. Now, as the paper was printed in the office of the defendant, by his servants, and for his profit, and

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

as he has never disavowed it, he is in law answerable for the contents.

The paper which contains the alleged libel was purchased at the defendant's office in September, 1820, by Ezekiel Morse, the servant of the Russian Consul, and carried to him, and marked at the time. This fact alone is evidence of publication ; it being a reasonable and well-known principle of law, that if a man sells a libel by his servant, it is considered as evidence of a publication by him, unless he show that the servant acted without or against his authority.

Jefferson Clark likewise testifies, that he believes the number of the New-England Galaxy, of the date of November 30, 1821, which contains the second alleged libel, was published by the defendant, being similar to the newspaper printed by him at that time. Nothing is shown from which you may infer that this paper is not a genuine number of the Galaxy which was issued on that day.

Secondly, are these pieces intended to reflect on the Russian Consul, and are they libels? As to the second piece, both the counsel for the defendant admit that it was intended to apply to that gentleman. And what is so admitted, requires no farther proof.

The first piece of evidence in relation to the application of the piece of the 1st September, 1820, is contained in the number of the "Euterpeiad," a paper which was published on the 26th of August preceding. In that is contained an article upon "Miss Enstaphieve," a daughter of the Russian Consul, relative to her extraordinary talents as a musical performer, and in reference to which article, it would seem from a postcript, this piece was written.

It appears from all the witnesses, that the Russian Consul had at that time a daughter in her twelfth year only, who was distinguished as a prodigy of musical talent, particularly for her powers of execution on the piano forte. Mr. John S. Ellery testified, that on reading the piece at the time, he instantly knew that it referred to the Russian Consul and his daughter, and that being his friend, and having taken an interest in his family from their first arrival in this country about fourteen years ago, he immediately carried the paper to him, and that it appeared deeply to wound his feelings.

Mr. Bryant P. Tilden testified, that he immediately knew that the piece alluded to the Russian Consul; that there were no other father and daughter in the city at that time to whom it could refer; and that it was a subject of great conversation in the Insurance Offices here, which you know, gentlemen, are places of great resort, where news is eagerly detailed, and where an article is not the less likely to attract attention for possessing something of a domestic character. Mr. Tilden, speaking of the talents of the young lady, says, that the late Dr. Geo. K. Jackson, a most eminent professor of music in this city, would set by her for hours hearing her performance, in admiration of her powers of execution.

Similar testimony was given by Mr. William Coffin. He believed that the piece could refer to no one but the Russian Consul, from his avowed fondness for music, and from the distinguished talents of his daughter, which was a subject of much conversation at that time among musicians and amateurs.

It was attempted in the defence to show, that the publication referred to a Mr. Lewis, who, with his children, two boys and a little girl, were in this city a few years

since. Some witnesses have testified, that this gentlemen had the reputation of treating his children with severity, and that it was owing to this, that the boys had attained to considerable excellence on the piano forte. If this were true, gentlemen, it would be nothing surprising, as we know it is almost impossible to secure the attention of children, and that they should attain to great accuracy in any literary or scientific pursuit without perpetual watchfulness, and the occasional application of severity. I have known some rare exceptions to this rule. But the celebrated Dr. Johnson acknowledged that he was indebted for his accuracy in the languages to the severity of his masters.

Mr. John Dodd, who was examined as a witness for the defendant, testified, that the daughter of Mr. Lewis never appeared in public; that the performances of the boys were remarkable for children; but that they were not equal to Christiana's, or what would be deemed rare or excellent in a professor. He farther testified that Mr. Lewis with his family left Boston some time in the year 1820, and that on reading the piece, he did not think it could refer to him and his children.

Messrs. Ellery, Tilden, and Dodd all agree in the fact, that the Russian Consul is a tender father, and passionately fond of his daughter, as well as proud of her accomplishments. And hence the eloquent counsel for the defendant raise an argument, that this piece could not be intended to refer to him. But, gentlemen, if from the evidence you believe that the piece was intended to refer to him and his daughter, then this fact would tend to show the *disposition* of its author, and you may fairly infer that he meant to wound Mr. Eustaphieve in the most susceptible point. For if he is an indulgent fa-

ther, it must wound him the more deeply to be accused of the want of natural affection. But it belongs to you to weigh all the evidence, and if you are not satisfied that the piece was meant to reflect on that gentleman, the defendant will be entitled to an acquittal.

BOSTON,
Jan. 1823.

The Com'th
v.
Buckingham.

Are the pieces complained of, libels? The first is averred to relate to the conduct of the Russian Consul as a parent towards his daughter. It says in substance, that the musical superiority of this young lady was effected by the incessant drilling of a cruel and heartless master;—that her astonishing rapidity of fingering produced no effect on the feelings, except pity for the haggard cheeks and feeble frame of the lifeless automaton;—that the parent had subjected his daughter to daily drudgery by threats, promises, and flattery, without alleviating her task by a ray of kindness or affection;—and that all the future prospects of the child were sacrificed at the altar of ambition. He concludes with invoking the indignation and contempt of an enlightened community upon the tyrant.

This paper is, in legal contemplation, a libel, because it exhibits the party intended as a heartless monster, devoid of natural affection, and sacrificing his daughter to gratify a senseless ambition;—thus containing that sort of malicious imputation which is calculated to vilify and bring a man into hatred and contempt.

*Malice* may be inferred from the publication, or proved by extrinsic evidence. It must often be extremely difficult to produce direct evidence of a malicious design, extrinsic and independent of the publication in question; but the publication itself will often afford the most convincing proof of malice. If the words are directly calculated to slander and degrade the character, the obvious inference is, that they were designed to have this effect, unless something can be drawn from the circumstances attending the publication to repel such an inference. All the circumstances, therefore, the manner, the occasion, and the matter of the publication, are most material and important considerations. Phil. Ev. p. 106. See also vol. 1. tit. Libel. 1 Maule and Selw. 273. 282.

Now if you believe that the defendant meant in this way to hold up the Russian Consul to the view of the public, with the malicious intent to bring upon him the hatred of the community, you will be warranted in pronouncing a verdict of guilty.

You are to judge of the motive, for there is no criminality without intention. Now, where a party has published a paper of this character of another, he is answerable for its legal effects;—" a criminal intent from doing a thing in itself criminal, without a lawful excuse, being an inference of law," unless he can negative the malicious motive. You will, therefore, next inquire whether the defendant has succeeded in this part of his defence. And here you will recollect and weigh the argument of the eloquent counsel for the defendant in this point. They have read the whole piece from which the libellous matter was extracted, and they deny it refers to any individual. They say that according to all the rules of fair criticism, it must be interpreted to relate to a *school* of musicians and performers, and not to the Russian Consul; and that it is plain that the object of the writer was to instruct, with a view to correct and improve the public taste.

Was the general object of the writer innocent and laudable? If perceiving that undue praise had been bestowed on what he deemed an improper object, and that it was likely to introduce a bad taste into the divine art of music; or that a sentiment prevailed which was calculated to injure the general education of young ladies, by taking off their attention from the useful branches of knowledge, and fixing them on the ornamental only, thus sacrificing mind to accomplishments; if you are satisfied that the general design of the writer was to discuss merely these subjects of general interest, then you

may fairly infer that his object was innocent and laudable. But if in prosecuting this his lawful object, he has maliciously strayed from it, and indulged himself in defaming the Russian Consul as a parent, then the general design of the piece will not excuse the wanton attack on the feelings and character of that gentleman.

As to the second piece complained of, I agree with the counsel for the defendant, that it is a " rude, uncouth, and indecorous piece, of which I should prefer to be the subject than the author." We look in vain to find in it any classical wit to disguise the feelings of the author towards the individual whom he meant to satirize. The whole piece has been read to you by the defendant's counsel, and you are to weigh the argument which they have made, and in which they insist that it is merely harmless wit, devoid of any malevolent design. I think, in passing judgment on it, you may fairly consider, whether you would feel wounded at finding yourselves elevated into the columns of a newspaper, to be gazed at by the passengers, and designated in the style in which it seemed good to the ingenious author of this piece, to display the life and opinions of Mr. Eustaphieve.

You are not to resort to strained rules of criticism, or to seek for the meaning of vulgar epithets, as was done with great ingenuity and effect by one of the defendant's counsel, in the almost to us unknown science of heraldry. But you are to exercise your own common sense, not imagining that because you are in a court of justice, you are to see with other eyes, or hear with other ears, or to judge with other judgment, than if you were by your own fire-side.

In this piece the author seems to delight in the figure

of the Bear, and to attach that appellation to Mr. Eustaphieve. He speaks of the "sign af the Bear and Fiddle"—he speaks of the Russian Consul " as sucking a Bear," like Romulus and Remus—he speaks of "the dancing Bear "—" the polar Bear "—" the Rugged Russian Bear"—and "of a set-to between the big Bear and a Dandy." He also alludes to his employment, as being fond of music, of fishing, of writing in the newspapers ; and there are some expressions of double meaning, which, if taken in their vulgar significations, are highly offensive. Now, gentlemen, weigh this in the judgment of common sense and common charity. If, on a deliberate view of it, you believe it was designed as a piece of criticism on an unfortunate author, as mere legitimate satire, with a view to correct the public taste, and to prevent the writer from indulging his vein for scribbling, it was harmless. But if, on the contrary, you believe that it was meant to represent the Russian Consul as an object of contempt and ridicule, to wound his feelings, and to sport with him in a land of strangers—then the laws of hospitality have been violated, as well as the laws of the land. For " if any man deliberately and maliciously publishes any thing in writing concerning another which renders him ridiculous, or tends to hinder mankind from associating, or having intercourse with him, it is a libel.

The jury, after being absent two hours, returned a verdict *Not Guilty* on the first count, and *Guilty* on the second.